Larry KERSHAW, Plaintiff
and Appellant,

v.

H.L. REICHERT, M.D.; R.S. Gruby, M.D.;
R.D. Anderson, M.D.; Richard Tschi-
der; Jack Eakman; Wm. Bianco, Sr.;
and Mary Neigum, Defendants and Ap-
pellees.

Larry KERSHAW, Plaintiff
and Appellant,

v.

H.L. REICHERT, M.D., and St. Alexius
Medical Center, Defendants
and Appellees.

Civ. Nos. 880214, 880249.

Supreme Court of North Dakota.

July 26, 1989.

Zuger Law Offices, Bismarck, for defen-
dant and appellee H.L. Reichert, M.D.; ar-
gued by William P. Zuger. Appearance by
Paul J. Bowlinger.

Zuger, Kirmis, Bolinske & Smith, Bis-
marck, for defendants and appellees St.
Alexius Medical Center, R.S. Gruby, M.D.,
R.D. Anderson, M.D., Richard Tschider,
Jack Eakman, Wm. Bianco, Sr., and Mary
Neigum; argued by Lance D. Schreiner.

Saefke Law Office, Bismarck, for plain-
tiff and appellant; argued by Frederick E.
Saefke, Jr.

MESCHKE, Justice.

Larry Kershaw appealed judgments dis-
missing his suits against H.L. Reichert,
M.D.; St. Alexius Medical Center; R.S.
Gruby, M.D.; R.D. Anderson, M.D.; Rich-
ard Tschider; Jack Eakman; Wm. Bianco,
Sr.; and Mary Neigum. We consider the
effect of federal regulations on the respon-
sibility of medical providers for unsuccess-
ful surgery. We affirm.

Dr. Reichert performed an intraocular
lens implant on Kershaw on March 2, 1983.

The implant was unsuccessful and Kershaw later suffered retinal detachment.

Kershaw sued Dr. Reichert and St. Alexius Medical Center, alleging, among other things, that they had not secured his informed consent to the surgery. The trial court dismissed St. Alexius Medical Center by summary judgment. Kershaw then sued Dr. Reichert again, together with the members of the Institutional Review Committee for St. Alexius Medical Center, made up of Gruby, Anderson, Tschider, Eakman, Bianco, and Neigum, alleging they failed to assure that Kershaw gave his informed consent to the surgery. The district court dismissed this second suit. The first suit against Dr. Reichert was tried to a jury, which returned a verdict for Dr. Reichert, and a judgment of dismissal was entered. Kershaw's appeals were consolidated for our review.

While Kershaw raised a number of issues on appeal, we address only three:[1]

(1) Did federal regulations authorize a private action against St. Alexius Medical Center, the members of its Institutional Review Committee, or Dr. Reichert?

(2) Must a hospital obtain a patient's informed consent for an operation?

(3) Did the trial court abuse its discretion in refusing evidentiary use of certain federal regulations?

Intraocular lens implants were regulated by the Federal Food, Drug and Cosmetic Act (FDCA) administered by the Food and Drug Administration (FDA). 21 U.S.C. § 301 *et seq.* FDA regulations at 21 CFR, part 813, allowed investigational surgery for intraocular lenses, required the appointment of institutional review committees by hospitals, and generally prescribed responsibilities of institutional review committees and investigators.

■ The FDCA does not expressly or inferentially authorize a private action for violations. *Pacific Trading Co. v. Wilson & Co., Inc.,* 547 F.2d 367 (7th Cir.1976). *Griffin v. O'Neal, Jones & Feldman, Inc.,* 604 F.Supp. 717 (S.D.Ohio 1985) carefully analyzed the FDCA and held that a private action may not be implied from it. *Griffin* used the accepted four-part analysis for ascertaining if a private action is implied from a federal statute. This four-part analysis was first developed in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). We have followed the *Cort* analysis in interpreting other federal enactments. *See Hillesland v. Federal Land Bank Ass'n,* 407 N.W.2d 206 (N.D.1987). We agree with *Griffin* in applying the *Cort* analysis to FDCA and to FDA's regulations. Conforming to that analysis, we conclude that FDA's regulations adopted pursuant to the FDCA did not authorize a private action against hospitals, institutional review committees, or doctors for unsuccessful intraocular implants.

■ "Generally there exists as an integral part of the physician's overall obligation to his patient the duty of reasonable disclosure of the available choices with respect to the proposed therapy and of the material and known risks potentially involved in each." *Winkjer v. Herr,* 277 N.W.2d 579, 587 (N.D.1979). However, a hospital generally has no duty to obtain a like informed consent from the same patient. *Krane v. Saint Anthony Hospital Systems,* 738 P.2d 75 (Colo.App.1987). As the court explained in *Krane:*

"It is the surgeon, and not the hospital, who has the technical knowledge and training necessary to advise each patient of the risks of the surgery prior to the patient giving his consent. Further, the hospital does not know the patient's medical history, nor the details of the particular surgery to be performed." 738 P.2d at 77.

Nothing about this case impels a deviation from the general rule. St. Alexius Medical

**1.** Counsel for Kershaw suggested in his principal brief:

"The bottom line for the resolution of this Appeal will be the determination, by this Court, on the relevancy and materiality of Federal regulations, promulgated by an administrative agency, pursuant to statute, for the protection of human subjects participating in a medical device research program."

Center had no duty to secure Kershaw's informed consent.

Because FDA's regulations did not authorize a private action and because the hospital had no duty to obtain his informed consent, Kershaw's suits against St. Alexius Medical Center and the members of its Institutional Review Committee were properly dismissed.

■ Violation of a statutory duty can be evidence of negligence. *Keyes v. Amundson*, 391 N.W.2d 602 (N.D.1986). *Compare Ross by Kanta v. Scott*, 386 N.W.2d 18 (N.D.1986). Kershaw argued that this rule applies to violation of a federal regulation and that the trial court abused its discretion in refusing to admit 21 CFR §§ 813.120 and 813.130 as evidence.[2] Kershaw contended that Dr. Reichert did not comply with these regulations, particularly § 813.130(a)(10), which called for disclosure that the investigational lens was being used for research purposes. To decide this case, we assume, without deciding, that violation of a federal regulation can be evidence without implying a private claim from the federal enactment.[3]

Trial courts have broad discretion in determining the relevancy of proffered evidence [*Bank of Steele v. Lang*, 399 N.W.2d 293 (N.D.1987)] and in controlling the introduction of cumulative evidence [*Williams County Social Services Board*

2. "§ 813.120 General requirements of informed consent.

"(a) The investigator shall (1) inform each human subject, or the subject's legal representative where the subject lacks legal capacity, that the intraocular lens is being investigated for safety and effectiveness, (2) provide each human subject, or his legal representative, an adequate explanation of pertinent information concerning the lens, including the information required in § 813.130, and (3) obtain and document legally effective informed consent of such subject, or his legal representative.

*   *   *   *   *   *

"(c) Informed consent shall be evidenced by a written agreement, signed by the subject or his legal representative."

"§ 813.130 Elements of informed consent in agreement.

"(a) The investigator shall assure that the subject or his legal representative signs an agreement that includes a complete explanation of pertinent information concerning the lens, adequate to enable him to make a decision of his willingness to participate or permit the subject to participate in the investigation, and which includes:

"(1) A full and fair explanation of procedures to be followed, including an identification of any which are experimental.

"(2) A full explanation of the nature, expected duration, and purpose of the administration of the lens.

"(3) A description of any attendant discomforts and risks reasonably to be expected.

"(4) An explanation of likely results should the procedure fail.

"(5) A description of any benefits reasonably to be expected.

"(6) A disclosure of any appropriate alternative procedures that might be advantageous for the subject, i.e., spectacles or contact lenses.

"(7) A description of the scope of the investigation, including the number of patients involved in the investigational study.

"(8) An offer to answer any inquiries concerning the investigational study.

"(9) An instruction that the subject, or his legal representative, is free to decline entrance into the investigational study or to withdraw his consent and to discontinue participation in the study at any time without prejudice to the subject.

"(10) A statement that the investigational lens is being used for research purposes.

"(b) The agreement entered into by such person or his legal representative shall include no exculpatory language through which the subject is made to waive, or to appear to waive, any of his legal rights or to release the institution or its agents, or the sponsor or the investigator from liability for negligence.

"(c) An investigator shall provide to the sponsor and to any institutional review committee a sample copy of any written materials given or read to the subject or his legal representative, including the information required to be given by paragraph (a) of this section and a sample copy of any form used to document the consent of such subject or his legal representative, and the form shall have been approved by the committee."

Sections 813.120 and 813.130 were contained in Subpart F of Part 813 dealing with investigational exemptions for intraocular lenses. Subpart F was removed, effective July 27, 1981. Thus, §§ 813.120 and 813.130 were not in effect at the time of Kershaw's surgery.

3. *See Lowe v. General Motors Corp.*, 624 F.2d 1373 (5th Cir.1980). *See also, Cappellini v. McCabe Powers Body Co.*, 713 F.2d 1 (2d Cir. 1983); *Lutz v. United States*, 685 F.2d 1178 (9th Cir.1982). *See generally*, 57A Am.Jur.2d *Negligence* § 801 (1989). *Compare, Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986).

*v. Falcon,* 367 N.W.2d 170 (N.D.1985)]. Our review is limited to determining if the trial court abused its discretion. *Williams County Social Services Board v. Falcon, supra.* "The exclusion of admissible evidence does not constitute reversible error when the excluded evidence is merely cumulative of other properly admitted evidence." *Weisenberger v. Senger,* 381 N.W.2d 187, 191 (N.D.1986). Exclusion of redundant evidence is rarely an abuse of discretion.

Kershaw testified on direct examination:

"Q. Now, before you signed that consent form, tell us, as best you can recall, what discussion, if any, you had with Dr. Reichert. What he said and what you said.

"A. Well, he looked at my eyes again, both of them, and he asked me if I was going to have the lens put in. And I said yes. And he handed me the papers. That's about all there was, that I can recall."

On cross-examination, Kershaw testified that, although he "had a complete opportunity to sit down and read it," he "voluntarily chose not to read" the consent form provided him by Dr. Reichert before signing it. Kershaw also testified on cross-examination:

"Q. Now, is there something that you feel wasn't contained on the form that should have been contained on the form?

"A. That I know now?

"Q. Yes.

"A. Yes.

"Q. What?

"A. Investigational, experimental— whatever.

"Q. You feel that it should have been stated on the form that it was investigational?

"A. I should have been told it was investigational before I was even handed them forms."

On redirect examination, Kershaw testified that he would not have consented to the lens implant if Dr. Reichert had told him that he was "going to be a subject in a research project under this investigational or experimental program."

Dr. Reichert testified on cross-examination:

"Q. ... What if anything did you tell him about the risks of having an implantation in his particular case?

"A. Well, let me answer that by telling you that we talk to the patient, and I'm sure I talked to Mr. Kershaw, about how the implant is going to benefit him, and that there are risks of surgery, you can't guarantee the surgical result, and you can have complications that are minor or major in nature, and you could even lose your vision and even lose the eye.

"Q. You believe that's what you told him about the risks involved in his particular case?

"A. I'm sure I did.

"Q. All right. How did you present this minimum standard informed consent form to him, that was used?

"A. After talking to the patient, then they usually are given the form, either by myself or, you know, one of my assistants. And they're asked to read through it, and if they have any questions, they should talk to us. If they don't have any questions, they have to sign it in the appropriate slot.

\*      \*      \*      \*      \*      \*

"Q. And in such words, quote/unquote, you didn't tell Larry Kershaw that this was a 'research' program that he was being included in?

\*      \*      \*      \*      \*      \*

"A. I'm sure that I didn't use those words."

The consent form supplied by Dr. Reichert and signed by Kershaw stated, in capital letters:

"The attached minimum standard informed consent for cataract operation, and/or implantation of intraocular lenses has been reviewed by the ophthalmic device classification panel (FDA) and the bureau of medical devices (FDA) for compliance with FDA regulations for the protection of human subjects.

\*      \*      \*      \*      \*      \*

*"Clinical investigation*

"The United States food and drug administration, in response to congressional mandate, is requiring an extensive clinical investigation of intraocular lenses to establish facts about safety and efficacy. I understand I have been asked to take part in this study because my doctor considers me a candidate. I understand the study involves a minimum one-year observation of the results of my surgery.... It is estimated that 50,000 individuals will receive intraocular lenses as patients in this study.

*"Consent for operation*

"In giving my permission for a cataract extraction and/or for the possible implantation of an intraocular lens in my eye, I declare I understand the following information:

\*  \*  \*  \*  \*  \*

"6. *Specific complications of lens implantations:* Insertion of an intraocular lens may induce complications which otherwise would not occur. In some cases complications may develop during surgery from implanting the lens days, weeks, months or even years later. Complications may include loss of corneal clarity, infection, uveitis, iris atrophy, glaucoma, bleeding in the eye, inability to dilate the pupil, dislocation of the lens and retinal detachment.

\*  \*  \*  \*  \*  \*

"... I understand that the implanting of an intraocular lens in my eye is part of a clinical investigation and that the periodic visits to the doctor by me will be required for at least one year to assess the results of the operation. I give permission for medical data concerning my operation and subsequent treatment to be submitted to the lens manufacturer and to the FDA for the clinical study described. I understand I may withdraw from the clinical study at any time without jeopardizing my future medical care. In signing this informed consent for cataract operation, and/or implantation of intraocular lens, I am stating I have read this informed consent (or it has been read to me) and I fully understand it and the possible risks, complications and benefits that can result from the surgery."

While this consent form did not use the word "research," it did stress the investigational nature of the implant procedure.

Thus, there was a great deal of evidence about whether Dr. Reichert secured the informed consent of Kershaw for the investigational intraocular lens implant. Kershaw and Reichert both testified on that subject. The consent form signed by Kershaw was in evidence and there was expert testimony about it's sufficiency. Regardless of whether Dr. Reichert complied in exact detail with every element of informed consent listed in §§ 813.120 and 813.130, the precise dispute on the adequacy of Dr. Reichert's disclosures for an informed consent was fully presented to the jury by the evidence admitted. The admission into evidence of §§ 813.120 and 813.130 would have been cumulative of other properly admitted evidence. Therefore, we conclude that the trial court did not abuse its discretion in excluding the regulations as evidence.

The judgments are affirmed.

VERNON R. PEDERSON and A.C. BAKKEN, Surrogate Justices and WALLACE D. BERNING and LEE A. CHRISTOFFERSON, District Judges, concur.

VERNON R. PEDERSON, and A.C. BAKKEN, Surrogate Justices, and WALLACE D. BERNING and LEE A. CHRISTOFFERSON, District Judges sitting in place of ERICKSTAD, C.J., and VANDEWALLE, GIERKE and LEVINE, JJ., disqualified.