RICHARD KUS, Plaintiff-Appellant, v. SHERMAN HOSPITAL, Defendant-Appellee.

Second District  No. 2—94—0156

Opinion filed January 5, 1995.

John M. Lamont, of Thompson, Lamont & Flaherty, P.C., of Aurora, for appellant.

D. Kendall Griffith, Nancy G. Lischer, and Christine L. Olson, all of Hinshaw & Culbertson, of Chicago, for appellee.

PRESIDING JUSTICE McLAREN delivered the opinion of the court:

The plaintiff, Richard Kus, brought suit against the defendants,

Sherman Hospital, Dr. Gordon Vancil, Americal International Corporation (Americal), and Surgidev Corporation (Surgidev), alleging negligence and medical battery relating to the implantation of intraocular lenses. The plaintiff entered into settlement agreements with Dr. Vancil, Americal, and Surgidev, and they are no longer parties to these proceedings. Kus' suit against Sherman Hospital proceeded to a jury trial, where the trial court granted a partial directed verdict for the hospital, dismissing a count charging the hospital with medical battery and a count charging the hospital with negligence in failing to respond adequately to a product recall involving the lens manufactured by Americal. A third count, based upon a negligence theory of lack of informed consent, went to the jury, which rendered a verdict for the hospital. The plaintiff appeals. We affirm in part, reverse in part, and remand.

Prior to the plaintiff's intraocular lens implantations, pursuant to the medical staff bylaws of Sherman Hospital, an institutional review board (IRB) was established at the hospital to protect the rights of patients who were human subjects of research. One of the functions of the IRB was to "require that a legally effective informed consent is obtained prior to conducting a research project." The bylaws of the IRB gave it "purview over all research or investigative activities" and reserved the right to "review the progress of all continuing studies *** for the purpose of safeguarding the rights of human subjects." Dr. Richard Fiedler chaired the Sherman IRB from 1978 to 1984 and testified that the purpose of the IRB was to make sure that the patient who was undergoing the procedure knew what he was getting into. Fiedler agreed that the IRB had the power to stop unsafe investigative practices. Specifically, Fiedler admitted that the IRB could stop a doctor from using consent forms which were not approved under the protocol for that specific research.

On March 5, 1980, Fiedler, on behalf of the IRB, issued a directive to all operating eye surgeons, including Dr. Vancil, which stated that "the original or a copy of the Informed Consent Form be on the chart of each patient undergoing an intraocular lens implant." On June 4, 1984, Fiedler issued a second directive to the same group of surgeons, which specified:

> "It is *** mandatory that prior to the insertion of one of these lenses that the hospital have a copy of the informed consent signed by the patient so that the lens can be implanted. Without the hospital's having the informed consent in its possession prior to the surgery, the surgery will not be allowed."

The consent form referred to was the FDA-approved consent, detailed below.

The plaintiff's vision began to deteriorate in 1984, and he first went to see Dr. Vancil in January 1985. Vancil recommended cataract surgery and a lens implant, which, he allegedly told Kus, were "quite safe." Kus testified that Vancil never told him that the lens Vancil intended to implant was under investigation for safety and effectiveness. Indeed, Vancil gave Kus a booklet which described intraocular lens implant surgery as a "tried and true method" of vision correction after cataract surgery. Prior to surgery, in Vancil's office, Kus was presented with an informed consent document to read over and sign, which Kus did. The informed consent document which Kus signed had been modified from the FDA-approved and Sherman IRB-sanctioned consent form by the removal of a paragraph on "clinical investigation," which was meant to inform the patient that the lens was under investigation for safety and efficacy. The consent form which Kus signed was then placed in his chart at Sherman Hospital. Eye surgery proceeded on July 15, 1985. Kus entered the operating room at 9:55 a.m., and surgery commenced at either 10:20 or 10:30 a.m., ending at 11:30 a.m. Vancil implanted an intraocular lens manufactured by Americal into Kus' left eye. On that same day, July 15, 1985, a letter from Americal arrived in the office of the president of the hospital, John Graham. The letter was addressed to the IRB chairperson and indicated that, by order of July 3, 1985, the FDA had withdrawn Americal's investigational device exemption for a number of lenses, including the type implanted in Kus' left eye, and stated that, "FDA has ordered that further implantations of Americal's IOLs be stopped and returned to Americal as soon as possible." There was no evidence presented as to the time the letter was actually received. Graham testified that if mail is not addressed to him but to the IRB chairperson, it could be received by his office as late as 3 or 4 p.m. Graham's secretary typically opens the mail and distributes it, and sometimes Graham's secretary does not open the mail until the afternoon. Graham further testified that he did not think his secretary would have opened the mail, or have taken appropriate action with regard to the recall letter, within half an hour of receiving it.

When the plaintiff's vision deteriorated in his right eye, Vancil again recommended the implantation of an intraocular lens, this time one manufactured by Surgidev, which at that point had not been recalled. When Kus questioned Vancil as to why Vancil did not recommend the Americal lens for the right eye, Vancil responded that Americal "did not keep up with their paperwork." Surgery on the right eye commenced on January 15, 1986, with allegedly no consent form in Kus' hospital chart. Kus claimed he signed the

consent form 2 to 10 days after the surgery, and the form then appeared in his hospital chart. Similar to the form for the surgery on Kus' left eye, the consent form for the right eye surgery was also modified, and the form made no reference to the fact that the lens was being evaluated for safety and effectiveness.

A receptionist for Dr. Vancil testified that the reason the informed consent forms were missing the section on "clinical investigation" was that Vancil directed the office staff to remove language from the consent form approved by Sherman Hospital's IRB because "he didn't want it on there." This removal was done for all of Vancil's 43 patients who underwent intraocular lens surgery at Sherman Hospital. A subpoena was issued for Dr. Vancil to testify, but it was returned not served.

The Medical Device Amendments of 1976 (MDA) to the Food, Drug and Cosmetic Act of 1938 authorize the Secretary of Health and Human Services to promulgate a regulatory scheme for the clinical investigation of experimental devices under an investigational device exemption. (21 U.S.C. § 301 *et seq.* (1988).) The purpose of such exemptions is:

> "[T]o encourage, to the extent consistent with the protection of the public health and safety and with ethical standards, the discovery and development of useful devices intended for human use and to that end to maintain optimum freedom for scientific investigators in their pursuit of that purpose." 21 U.S.C. § 360(j)(g)(1) (1988).

In the year following the enactment of the MDA, the FDA issued regulations providing for "Investigational Exemptions for Intraocular Lenses." (21 C.F.R. § 813.1 *et seq.* (1993).) The regulations detail the application process by which intraocular lenses can be implanted into human subjects. Under the terms of the regulations, Sherman Hospital was an "institution," which is defined as a hospital which "engages in the conduct of research on human subjects." (21 C.F.R. § 813.3(i) (1993).) The IRB of an "institution" is charged with the responsibility to review and monitor all investigational studies of intraocular lenses. (21 C.F.R. § 813.60 (1993).) Specifically, the IRB:

> "[Shall] assure that the rights of human subjects are properly protected, *that legally effective informed consent is obtained, and that the method of obtaining consent properly informs the human subject of the significant aspects of the study* in accordance with Part 50 of this chapter." (Emphasis added.) (21 C.F.R. § 813.66(a)(6) (1993).)

Part 50, dealing with IRB's, requires that each subject be provided with basic information, including:

"A statement that the study involves research, an explanation of the purposes of the research and the expected duration of the subject's participation, a description of the procedures to be followed, and *identification of any procedures which are experimental*." (Emphasis added.) (21 C.F.R. § 50.25(a)(1) (1993).)

Part 50 also requires that informed consent be "documented by the use of a written consent form approved by the IRB and signed by the subject." (21 C.F.R. § 50.27(a) (1993).) The IRB's are also required to conduct "continuing review of research" on at least an annual basis, which includes the duty to review the informed consent process. (21 C.F.R. § 56.109 (1993).) In the case at bar, the defense's expert witness, Earnest Prentice, admitted that, if Sherman Hospital's IRB had audited any of Dr. Vancil's charts in the $1^1/_2$ years before Kus' surgery, the IRB would have discovered Vancil's use of the modified consent form. Additionally, Prentice admitted that a choice existed at Sherman Hospital by September 1, 1983, between an FDA-approved lens and the experimental lenses which were implanted into Kus' eyes.

After the implants in Kus' eyes allegedly caused difficulty and permanent damage due to their design, Kus filed suit against Sherman Hospital, alleging, in part: (1) medical battery, (2) negligence under a lack of informed consent theory, and (3) negligence for failing to respond adequately to a product recall involving the lens manufactured by Americal. The trial court dismissed the medical battery and negligence involving the recall claims by directed verdict. The jury returned a verdict for the hospital on the negligence count for the lack of informed consent.

■ The first issue to which we turn involves the scope of the preemption clause of the MDA. While other jurisdictions have probed the preemptive reach of the MDA, our research reveals that Illinois courts have yet to encounter this issue. Article VI of the United States Constitution declares that Federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (U.S. Const., art. VI.) As a result, State or local laws that conflict with Federal law and regulations are "without effect." (*Cipollone v. Liggett Group, Inc.* (1992), 505 U.S. 504, 516, 120 L. Ed. 2d 407, 422, 112 S. Ct. 2608, 2617.) Review under the supremacy clause begins with the " 'assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress.' " (*Cipollone*, 505 U.S. at 516, 120 L. Ed. 2d at 422, 112 S. Ct. at 2617, quoting *Rice v. Santa Fe Elevator Corp.* (1947), 331 U.S.

218, 230, 91 L. Ed. 1447, 1459, 67 S. Ct. 1146, 1152.) Accordingly, the purpose of Congress is " 'the ultimate touchstone.' " *Cipollone*, 505 U.S. at 516, 120 L. Ed. 2d at 422, 112 S. Ct. at 2617, quoting *Malone v. White Motor Corp.* (1978), 435 U.S. 497, 504, 55 L. Ed. 2d 443, 450, 98 S. Ct. 1185, 1189.

■ Federal laws can invalidate State or local laws in three ways. First, Congress' intent may be " 'explicitly stated in the statute's language or implicitly contained in its structure and purpose.' " (*Cipollone*, 505 U.S. at 516, 120 L. Ed. 2d at 422-23, 112 S. Ct. at 2617, quoting *Jones v. Rath Packing Co.* (1977), 430 U.S. 519, 525, 51 L. Ed. 2d 604, 614, 97 S. Ct. 1305, 1309.) Second, without express congressional command, "[S]tate law is pre-empted [*sic*] if that law actually conflicts with federal law." (*Cipollone*, 505 U.S. at 516, 120 L. Ed. 2d at 423, 112 S. Ct. at 2617).) Third, State law is preempted if "federal law so thoroughly occupies a legislative field ' "as to make reasonable the inference that Congress left no room for the States to supplement it." ' " *Cipollone*, 505 U.S. at 516, 120 L. Ed. 2d at 423, 112 S. Ct. at 2617, quoting *Fidelity Federal Savings & Loan Association v. de la Cuesta* (1982), 458 U.S. 141, 153, 73 L. Ed. 2d 664, 675, 102 S. Ct. 3014, 3022, quoting *Rice*, 331 U.S. at 230, 91 L. Ed. at 1459, 67 S. Ct. at 1152.

Bearing these principles in mind, we turn to the language of the MDA, which states:

"(a) General Rule

Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter." (21 U.S.C. § 360(k) (1988).)

Thus, States may not impose requirements differing from or adding to the FDA requirements which relate to the safety or effectiveness of the device in question. A State "requirement" may stem from any requirement established by a State, including statutes, regulations, ordinances, or court decisions. 21 C.F.R. § 808.1(b) (1993); see also *San Diego Building Trades Council, Millmen's Union, Local 2020 v. Garmon* (1959), 359 U.S. 236, 247, 3 L. Ed. 2d 775, 784, 79 S. Ct. 773, 780 ("regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy").

■ The field of preemption established by the MDA has been interpreted to be "broad, but limited." (*King v. Collagen Corp.* (1st Cir. 1993), 983 F.2d 1130, 1134, *cert. denied* (1993), 510 U.S. 824, 126 L. Ed. 2d 52, 114 S. Ct. 84.) With regard to claims arising from intraocular lens implantations, the MDA has been held to preempt State claims involving the safety or efficacy of the lenses. Thus, courts have dismissed claims brought under State law for negligent design (*Hunsaker v. Surgidev Corp.* (M.D. Pa. 1992), 818 F. Supp. 744, 753; *Slater v. Optical Radiation Corp.* (7th Cir. 1992), 961 F.2d 1330, *cert. denied* (1992), 506 U.S. 917, 121 L. Ed. 2d 246, 113 S. Ct. 327; *Covey v. Surgidev Corp.* (N.D. Ohio 1993), 815 F. Supp. 1089), strict liability in tort (*Duncan v. Iolab Corp.* (11th Cir. 1994), 12 F.3d 194, 195; *Covey*, 815 F. Supp. 1089), breaching an implied warranty (*Duncan*, 12 F.3d 194), failing to exercise due care in conducting premarket approval testing of the lenses (*Hunsaker*, 818 F. Supp. 744; *Slater*, 961 F.2d 1330), carelessly conducting quality control of the lenses (*Hunsaker*, 818 F. Supp. 744), failing to warn (*Slater*, 961 F.2d 1330 (though the court criticized counsel for phrasing a claim in these terms); *Covey*, 815 F. Supp. 1089), and failing to "exercise due and proper care under the circumstances" (*Hunsaker*, 818 F. Supp. at 752).

The MDA does not, however, preempt other State claims which do not relate to the safety or the effectiveness of the experimental device. With respect to intraocular lenses, Judge Posner has written that the preemptive provisions of the MDA do "not affect cases charging negligence in the implantation or removal of a lens, or complaining of contamination of the lens by bacteria or fungi or of *failure to obtain the patient's informed consent due to the procedure.*" (Emphasis added.) (*Slater*, 961 F.2d at 1334; see also *Kershaw v. Reichert* (N.D. 1989), 445 N.W.2d 16, 17 (informed consent claim for intraocular lenses was decided under State law because the court found no implied private right of action under the MDA, an issue we decline to consider); *Mitchell v. Iolab Corp.* (E.D. La. 1988), 700 F. Supp. 877 (informed consent claim for intraocular lenses, as well as other unspecified tort claims, was not preempted by the MDA. We note, however, that to the extent the *Mitchell* court relies upon its strained interpretation of 21 C.F.R. § 50.20 (1993), as explained in *Hunsaker* (818 F. Supp. at 750), we disagree with its reasoning).) We note for clarification purposes that the case before the bar has appeared before us previously. In *Kus v. Sherman Hospital* (1990), 204 Ill. App. 3d 66 (*Kus I*), we decided upon the applicability, constitutionality, and penalty for violation of section 2—622 of the Code of Civil Procedure (735 ILCS 5/2—622 (West 1992)). We did not hold in *Kus I* that Kus' lack of informed consent complaint was not preempted by the MDA.

Judge Posner was thus in error for citing *Kus I* for that proposition in *Slater* (961 F.2d at 1334); however, perhaps demonstrating judicial premonition, Judge Posner correctly surmised our holding today in the same case. The MDA does not preempt claims under Illinois law relating to the lack of informed consent for intraocular lens implantations, for those claims do not relate to the safety or efficacy of the lenses, as is required for preemption to occur. 21 U.S.C. § 360(k) (1988).

Turning now to the other issues in the case, the standards for granting directed verdict motions in this State are clear. Verdicts should be directed only in those cases in which all of the evidence, when viewed in a light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. (*Thacker v. UNR Industries, Inc.* (1992), 151 Ill. 2d 343, 353; *Knight v. Haydary* (1992), 223 Ill. App. 3d 564, 579.) The same standard is applied by a reviewing court. *Knight*, 223 Ill. App. 3d at 579.

With these guidelines in mind, we agree with the plaintiff that the trial court erred in granting a directed verdict on the plaintiff's medical battery claim. Clearly, the medical battery claim is warranted under existing law. In Illinois, two causes of action exist for lack of consent to medical procedures—an action based on negligence and an action based on battery. (*Mink v. University of Chicago* (N.D. Ill. 1978), 460 F. Supp. 713, 717.) In *Mink*, the court, interpreting Illinois law, held a medical battery theory had been properly pleaded where the plaintiffs "were the subjects of an experiment whereby nonemergency treatment was performed upon them without their consent or knowledge." (*Mink*, 460 F. Supp. at 717; *Guebard v. Jabaay* (1983), 117 Ill. App. 3d 1, 7 ("where an unauthorized surgeon operates, he commits a technical trespass to the patient resulting in the intentional tort of battery").) At the core of an action for battery " 'is not the hostile intent of the defendant, but rather the absence of consent to the contact on the part of the plaintiff.' " (*Gaskin v. Goldwasser* (1988), 166 Ill. App. 3d 996, 1012, quoting W. Prosser, Law of Torts § 9, at 35 (4th ed. 1971).) Furthermore, a claim of medical battery was found to extend to cases where the treatment given was "substantially at variance" with the consent given. (Emphasis omitted.) (*Gaskin*, 166 Ill. App. 3d at 1012.) Thus, medical battery is a valid legal claim in this State.

In the case at bar, we determine that a hospital, as well as a physician, may be held liable for a patient's defective consent in a case involving experimental intraocular lenses, and thus the plaintiff's claim is therefore viable. Two of our sister States have

recently considered this very issue. While we are not bound by their decisions (*Snyder v. Ambrose* (1994), 266 Ill. App. 3d 163, 167), we find their analyses enlightening. In *Kershaw v. Reichert*, a case cited by neither party, the supreme court of North Dakota affirmed a decision to dismiss a suit alleging lack of consent in an intraocular lens implantation, refusing to deviate from the general rule that, unlike the physician, "a hospital generally has no duty to obtain a like informed consent from the same patient." (*Kershaw*, 445 N.W.2d at 17.) Our research indicates that this is also the general rule in Illinois. (*Pickle v. Curns* (1982), 106 Ill. App. 3d 734, 738; *Winters v. Podzamsky* (1993), 252 Ill. App. 3d 821, 825.) The rationale underlying this rule is that the physician has the " 'technical knowledge and training necessary to advise each patient of the risks,' " and that " 'the hospital does not know the patient's medical history, nor the details of the particular surgery to be performed.' " (*Kershaw*, 445 N.W.2d at 17, quoting *Krane v. Saint Anthony Hospital Systems* (Colo. App. 1987), 738 P.2d 75, 77; *Pickle*, 106 Ill. App. 3d at 738.) However, in *Friter v. Iolab Corp.* (1992), 414 Pa. Super. 622, 607 A.2d 1111, a Pennsylvania court determined that the underlying rationale for the general rule is not applicable to a claim based on lack of informed consent to an experimental intraocular lens implantation. The *Friter* court stated, "the hospital, as a participant in a clinical investigation for the FDA, specifically assumed a duty to ensure that an informed consent was obtained by any patient participating in the study." 414 Pa. Super. at 628, 607 A.2d at 1113.

We find the reasoning of the *Friter* court persuasive. (414 Pa. Super. 622, 607 A.2d 1111.) By becoming a participating institution in this particular study, Sherman Hospital was charged with assuring that "legally effective informed consent" was obtained prior to the experimental surgery (21 C.F.R. § 813.66(a)(6) (1993)) and that "procedures which are experimental" needed to be identified before such surgery occurred. (21 C.F.R. § 50.25(a)(1) (1993).) While we agree that generally a hospital is not in the best position to inform a patient of risks, here it is clear that Sherman Hospital undertook the responsibility to inform the plaintiff of the experimental nature of his surgery. Moreover, a participating institution in the intraocular lens study is required to conduct "continuing review of research" under the Federal guidelines, which includes the duty to review the informed consent process (21 C.F.R. § 56.109 (1993)). Thus, Sherman Hospital also had the minimal duty here of checking to ensure that the form its IRB had promulgated was being used. We determine that the particular facts in the case before us require a determination that a hospital, as well as a physician, may be liable for claims

arising from the lack of informed consent in this instance. Thus, the plaintiff's medical battery count is viable under Illinois law.

Our review of the record in the present case reveals that the plaintiff had also presented sufficient evidence to tender his medical battery claim to the jury. This court has held, "[i]t is improper to direct a verdict when substantial factual disputes presented by the evidence require the assessment of witness credibility or the election between conflicting evidence, which fall within the jury's function." (*Sloan v. O'Dell* (1987), 159 Ill. App. 3d 268, 272.) Evidence in the record indicates that here the consent form approved by Sherman Hospital's IRB was modified by Dr. Vancil so that Kus allegedly did not know that he was participating in an experiment. Whether those modifications amounted to Kus' consent being "substantially at variance" with the treatment he actually received—that of an experimental nature—or whether Kus did or did not know of the experimental nature of the treatment are issues which necessarily belong before the jury. (*Sloan*, 159 Ill. App. 3d at 272.) The evidence we glean from the record here clearly does not so overwhelmingly favor the hospital that a contrary verdict could ever stand, and granting a directed verdict on the medical battery count was therefore prejudicial error. *Thacker*, 151 Ill. 2d at 353; *Knight*, 223 Ill. App. 3d at 579.

■ The plaintiff also claims that the jury verdict for the defendant with respect to the plaintiff's negligence claim for lack of informed consent is subject to reversal due to an incorrect jury instruction. We agree. The trial court instructed the jury that "[t]he only way you may decide that Sherman Hospital had a duty to determine that Richard Kus had given his informed consent is if you conclude that such a duty was imposed by federal laws and regulations presented to you at this trial." This instruction was in error, for " '[w]hether under the facts of the case there is a relationship between the parties as to require that a legal obligation be imposed upon one for the benefit of another is a question of law to be determined by the court.' " (*Rowe v. State Bank* (1993), 247 Ill. App. 3d 686, 690, quoting *Rowe v. State Bank* (1988), 125 Ill. 2d 203, 215.) Thus, the determination of whether a duty existed is for the court, not the jury (*Pelham v. Griesheimer* (1982), 92 Ill. 2d 13, 18-19), and the trial court erred by abdicating its role as arbiter of the law.

■ The defendant contends that Kus waived the instruction issue by not objecting to the instruction and not raising it in his post-trial motions. We disagree. Generally, the failure to object to alleged defects in the instructions is considered a waiver of the objection. (*Deal v. Byford* (1989), 127 Ill. 2d 192, 202-03.) The failure to include an objection in a post-trial motion may also result in waiver. (*Zoerner*

*v. Iwan* (1993), 250 Ill. App. 3d 576, 585.) However, the waiver rule is a limitation on the parties to an appeal, not on the reviewing court. (*Illinois Graphics Co. v. Nickum* (1994), 159 Ill. 2d 469, 496.) Accordingly, the waiver rule may be disregarded in the interests of justice (*People v. Bailey* (1994), 159 Ill. 2d 498, 506; *Ryan v. Katz* (1992), 234 Ill. App. 3d 536, 542) if the improprieties would deprive the plaintiff of a fair trial. (*Ryan*, 234 Ill. App. 3d at 542.) Permitting a jury to assume a judicial role in determining whether a duty existed, especially where we determine that a duty did exist as a matter of law, deprives the plaintiff of a fair trial. We therefore decline to find this issue waived. Consequently, we reverse the jury's verdict on this count and remand this count back to the trial court for retrial.

■ The plaintiff finally argues that the trial court erred in granting a motion for a directed verdict on the plaintiff's claim that the hospital was negligent in failing to stop the July 15, 1985, operation, which occurred at either 10:20 or 10:30 in the morning, in light of the recall notice the hospital received on that same day. We disagree. Kus has failed to present sufficient evidence which would preclude a directed verdict on this count. Kus relies upon the testimony of Sherman Hospital's president, John Graham, that the mail may arrive as early as 9:45 in the morning. Graham did not state, however, that the mail always arrived at 9:45 a.m. or that the mail in fact arrived at 9:45 a.m. on July 15, 1985. It is sheer speculation that the recall notice reached Graham's office by 9:45 a.m., or even 10:30 a.m. Speculation, imagination, and mere conjecture do not give rise to liability. (*Kalata v. Anheuser-Busch Cos.* (1991), 144 Ill. 2d 425, 437; *American Family Insurance Co. v. Village Pontiac-GMC, Inc.* (1992), 223 Ill. App. 3d 624, 629.) Consequently, the trial court properly granted a directed verdict for Sherman Hospital on this count. *Thacker*, 151 Ill. 2d at 353.

For the foregoing reasons, the decision of the circuit court of Kane County to grant a partial directed verdict for the defendant on the count that Sherman Hospital was negligent in failing to stop the July 15, 1985, operation is affirmed. The circuit court's decision granting a partial directed verdict for the defendant on the medical battery count and the jury's verdict on the negligent failure to obtain informed consent claim are reversed, and the cause is remanded for further proceedings consistent with this opinion.

Affirmed in part; reversed in part and remanded.

INGLIS and GEIGER, JJ., concur.