IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| Buu Nguyen, | ) | OPINION |
| | ) | |
| Plaintiff and Appellant, | ) | Case No. 20110152-CA |
| | ) | |
| v. | ) | |
| | ) | F I L E D |
| *IHC Medical Services, Inc., dba Primary* | ) | (October 25, 2012) |
| *Children's Medical Center*; University of | ) | |
| Utah Hospitals and Clinics; University | ) | 2012 UT App 288 |
| of Utah; and State of Utah, | ) | |
| | ) | |
| Defendants and *Appellee*. | ) | |

-----

Third District, Salt Lake Department, 030901469
The Honorable Sandra N. Peuler

Attorneys: Matthew H. Raty and Cory B. Mattson, Sandy, for Appellant
Robert G. Wright, Brandon B. Hobbs, Zachary E. Peterson, and Cortney
Kochevar, Salt Lake City, for Appellee

-----

Before Judges Orme, Davis, and Roth.

ORME, Judge:

¶1      On interlocutory appeal, plaintiff Buu Nguyen challenges the district court's grant of summary judgment dismissing Intermountain Health Care (IHC), which operates Primary Children's Medical Center (PCMC), from this action. The trial court held that PCMC did not have a separate and distinct legal duty to obtain Nguyen's informed consent before using a sales demonstration ventilator on his critically injured son. Nguyen argues that this issue was already decided when this court previously

heard from these parties in *Nguyen v. IHC* (*Nguyen I*), 2010 UT App 85, 232 P.3d 529, and held that the defendants, generally, had a duty to obtain informed consent.[1] IHC contends that while this court's earlier ruling determined that a duty was owed, that duty should fall squarely on the treating physician and not extend to PCMC. Nguyen argues in the alternative that, even if not decided previously, this court should now hold that the hospital owed a duty to obtain consent, separate and distinct from the duty owed by the treating physician. We reverse and remand on the basis that, while IHC identifies the generally applicable rule, in this atypical case, where the equipment utilized is not used in the regular course of treatment, PCMC had a separate and distinct legal duty to obtain informed consent.

BACKGROUND[2]

¶2      Nguyen's son suffered severe injuries in a car accident and was admitted into the pediatric intensive care unit (PICU) at PCMC for treatment. Dr. Madeline Witte was assigned to care for the child in the PICU. The child had sustained competing lung and brain injuries, and at some point Dr. Witte determined that a different course of treatment than the child was receiving might be in order. First, however, Dr. Witte felt that a CT scan of the child's brain was a "very critical" preliminary step in assessing his condition. In order to conduct the CT scan, the child needed to be transported to the radiology department on a different floor of the hospital. The child needed a high-

---

[1]Our earlier opinion did not parse out the liability with regard to specific defendants. We simply stated:

> Because there was a total absence of any disclosure about the ventilator's experimental status and because the [trial] court's sole rationale given for granting summary judgment was the absence of expert testimony, we reverse the grant of summary judgment in favor of Defendants on the claim of failure to obtain informed consent. On that claim, we remand for trial or such other disposition as may now be proper.

*Nguyen I*, 2010 UT App 85, ¶ 18.

[2]A more complete statement of the underlying facts of this case is set forth in *Nguyen I*. *See* 2010 UT App 85, ¶¶ 2–5.

powered ventilator to maintain his cardiac function during transport between floors. At the time, PCMC had a portable sales demo ventilator on the premises that it was considering for purchase as a life-flight transport ventilator. There is conflicting evidence as to the motivations of Dr. Witte in using the transport ventilator—whether it was a fortuitous turn of events that this unit was available, as it was the only piece of appropriate medical equipment on-site, or whether Nguyen's son was conveniently available to serve as a test patient on a day that had not yielded any potential subjects consistent with the test protocol for the ventilator. For purposes of our analysis, the distinction is irrelevant.

¶3 It is noteworthy, however, that Dr. Witte served as a member of an IHC committee assigned to test, evaluate, and acquire a new life-flight transport ventilator. She was also the director of PCMC's life-flight program.[3] Additional members of the committee included its chair, IHC employee Tammy Bleak, an IHC life-flight nurse who also served as IHC's Children's Services Equipment Specialist; several neo-natal life-flight nurses; and an IHC clinical engineer. The sales demo ventilator was in the hospital for testing and evaluation purposes and was not intended for use in routine patient care. The committee, of which Dr. Witte was a member, had established a protocol for the testing and use of the ventilator, which included that it was to be used only on moderately ill, medically stable children. Additionally, the committee had given Dr. Witte the task of creating an informed consent document for parents to sign before the ventilator was used.

¶4 It is undisputed that the committee was aware that Dr. Witte was considering using the test ventilator on Nguyen's son, a critically ill patient who could not survive an interruption in ventilation. Dr. Witte called Tammy Bleak and received the committee's permission to use the device while transporting the child.[4] IHC personnel

---

[3]Although Dr. Witte was a full-time employee of the nearby University of Utah, IHC paid $20,000 annually for Dr. Witte's services as PCMC's Medical Director of Life-Flight Services.

[4]Tammy Bleak admitted that part of her duties as IHC's Children's Services Equipment Specialist was to ensure reliability of the sales demo ventilator through completion of the testing and evaluation process before allowing the device to be used on a patient outside of the testing and evaluation parameters. She testified at her

(continued...)

involved with testing and evaluating the ventilator arrived to observe the equipment in use. A salesman employed by the vendor was also present to answer any questions about the ventilator. The committee members and other hospital personnel were aware that the ventilator was a sales demo that had not been used by the hospital and had the potential to fail.[5] The ventilator had not been used to transport anyone at PCMC and had not even been connected to a patient. At the time of its use, the child was classified as critically ill and medically unstable.

¶5 Nguyen's son was connected to the device in the PICU and monitored for approximately an hour. The machine functioned properly during that time, providing the same level of support as the child's bedside ventilator. The child was then transported without incident to the radiology department for the CT scan. While the child was being transported back to the PICU, however, the ventilator suddenly lost power and ceased working. The child died soon after. An investigation performed by the ventilator's manufacturer determined that the ventilator likely lost power because a screw made contact with the ventilator's motherboard, causing the device to short circuit.[6] The investigation did not reveal any misuse by the health care providers and the lead investigator testified that the providers could not have known about the screw problem.

ISSUES AND STANDARDS OF REVIEW

¶6 Nguyen argues that this court decided in *Nguyen I* that IHC owed a legal duty to obtain Nguyen's informed consent before using the ventilator on his son and that the

---

[4](...continued)
deposition, "I was the one who had contact with the vendors . . . so [Dr. Witte] would have called me as the chair of the committee to say, we have a patient we could use this on. That's why I was called."

[5]We note that, while untested by PCMC at the time of its use on Nguyen's son, the ventilator was approved by the FDA for use on pediatric patients in intensive care units and for use in transporting pediatric patients.

[6]The manufacturer reached a settlement with Nguyen and is not a party to this action.

trial court failed to comply with the law of the case in granting summary judgment to IHC on remand.  "Reviewing whether a district court complied with the mandate of an appellate court presents a question of law, which we review for correctness." *Anderson v. Thompson*, 2010 UT App 359, ¶ 3, 248 P.3d 981 (citation, brackets, and internal quotation marks omitted).

¶7     Alternatively, Nguyen argues that the trial court erred in granting summary judgment in favor of IHC, either because there is a duty imposed by statute, *see* Utah Code Ann. § 78B-3-406(1) (2008),[7] or because IHC assumed a duty.  The interpretation of a statute presents a question of law reviewed under the correctness standard, affording no deference to the district court.  *See Utah Dep't of Transp. v. Ivers*, 2009 UT 56, ¶ 9, 218 P.3d 583.  "An appellate court reviews a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness, and views the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (citations and internal quotation marks omitted).


ANALYSIS

I.  Law of the Case under *Nguyen I*

¶8     Nguyen first asserts that the district court committed reversible error in even considering IHC's motion for summary judgment.  Nguyen argues that IHC was bound by the law of the case as set forth in *Nguyen I* and should have petitioned this court for rehearing if unhappy with what Nguyen views as our mandate rather than trying to revisit the question of its liability following our remand to the district court.  *See generally Thurston v. Box Elder County*, 892 P.2d 1034, 1038 (Utah 1995) ("The lower court must not depart from the [appellate court's] mandate, and any change with respect to the legal issues governed by the mandate must be made by the appellate court that established it or by a court to which it, in turn, owes obedience.  In addition, the lower

---

[7]The statutes involved have not been revised, in a manner material to this case, subsequent to the events giving rise to this action.  Therefore, we cite the current version of the Utah Code as a convenience to the reader.

court must implement both the letter and spirit of the mandate, taking into account the appellate court's opinion and circumstances it embraces.") (internal citations omitted).

¶9     We disagree with Nguyen that our prior opinion necessarily held that IHC was subject to liability on informed consent grounds. We conclude that it was consistent with the remand we ordered in the first appeal "for trial or such other disposition as may now be proper," *Nguyen I*, 2010 UT App 85, ¶ 18, for IHC to then test its theory that the duty to obtain informed consent did not extend to the hospital, even if the duty extended to the defendants generally. *Cf. Halladay v. Cluff*, 739 P.2d 643, 645 n.5 (Utah Ct. App. 1987) ("Trial courts are in a much better position to evaluate an entire case, including its nuances and undisclosed pitfalls, than an appellate court. It is for this reason that where, as in this case, all possible ramifications of a decision on appeal may not be readily apparent, a case will be remanded for such proceedings as are appropriate in view of the guidance offered in the opinion."). Therefore, the trial court did not err when, on remand, it considered IHC's motion for summary judgment on the issue of informed consent as it pertains to PCMC.

## II. Duty to Obtain Informed Consent

### A. Traditional Interpretation of the Statutory Duty as Applied to Hospitals

¶10    We next consider whether IHC owed an independent duty, separate and distinct from the obligation of the treating physician, to obtain Nguyen's informed consent before using the ventilator on his son. The requirements for informed consent are prescribed by statute, *see* Utah Code Ann. § 78B-3-406 (2008), and require a plaintiff to establish the following to recover for a provider's failure to obtain informed consent:

> (a) that a provider-patient relationship existed between the patient and the health care provider;
>
> (b) the health care provider rendered health care to the patient;
>
> (c) the patient suffered personal injuries arising out of the health care rendered;

(d) the health care rendered carried with it a substantial and significant risk of causing the patient serious harm;

(e) the patient was not informed of the substantial and significant risk;

(f) a reasonable, prudent person in the patient's position would not have consented to the health care rendered after having been fully informed as to all facts relevant to the decision to give consent; and

(g) the unauthorized part of the health care rendered was the proximate cause of personal injuries suffered by the patient.

*Id.* § 78B-3-406(1). "Health care provider" is expansively defined as follows:

"Health care provider" includes any person, partnership, association, corporation, or other facility or institution who causes to be rendered or who renders health care or professional services as a hospital, health care facility, physician, registered nurse, licensed practical nurse, nurse-midwife, licensed Direct-entry midwife, dentist, dental hygienist, optometrist, clinical laboratory technologist, pharmacist, physical therapist, podiatric physician, psychologist, chiropractic physician, naturopathic physician, osteopathic physician, osteopathic physician and surgeon, audiologist, speech-language pathologist, clinical social worker, certified social worker, social service worker, marriage and family counselor, practitioner of obstetrics, or others rendering similar care and services relating to or arising out of the health needs of persons or groups of persons and officers, employees, or agents of any of the above acting in the course and scope of their employment.

*Id.* § 78B-3-403(12) (Supp. 2012).

¶11   IHC concedes that PCMC falls within the statutory definition of a health care provider but argues that whether its classification as a health care provider necessarily triggers an independent duty to obtain informed consent is more complicated. In this, IHC is correct. While courts usually "give effect to the purpose and intent" of statutes, *Hoyer v. State*, 2009 UT 38, ¶ 22, 212 P.3d 547, we recognize that, in practice, the duty to obtain informed consent has generally fallen on the treating physician, *see Wells v. Storey*, 792 So. 2d 1034, 1038 (Ala. 1999) ("Although the question whether nurses and hospitals have an independent duty to obtain the informed consent of a patient is a question of first impression in this state, approximately one-half of the states have addressed this issue. In those states, the courts have uniformly held that the duty to obtain a patient's informed consent rests solely with the patient's physician, rather than with a hospital or its nurses (unless, because of special circumstances, the physician is an agent for the hospital)."); *Auler v. Van Natta*, 686 N.E.2d 172, 174 (Ind. Ct. App. 1997) ("Although this issue has not previously been decided in Indiana, the majority of courts which have considered the question have declined to impose upon hospitals a general duty to obtain a patient's informed consent.");[8] *Giese v. Stice*, 567 N.W.2d 156, 162 (Neb. 1997) ("The vast majority of courts considering the issue have declined to impose upon hospitals the general duty to obtain informed consent.") (citation and internal quotation marks omitted). *See also, e.g., Ward v. Lutheran Hosps. & Homes Soc'y of Am.*, 963 P.2d 1031, 1038 (Alaska 1998) ("Although several health care professionals and institutions may meet the definition of 'health care provider' under [the Alaska statute] and may be involved in a patient's care, only the health care provider who proposes and orders a

_____

[8]*Auler* also addressed the potential in that case for a claim against the hospital under a vicarious liability theory. *See* 686 N.E.2d at 175. On appeal, Nguyen points to the hospital's involvement by way of Dr. Witte acting as the Medical Director of Pediatric Life-Flight and serving on the committee responsible for testing the ventilator and contends that "the evidence shows that Dr. Witte [was] IHC's officer, employee, and/or agent." However, beyond this passing mention, a vicarious liability claim is not developed. *See generally* Utah R. App. P. 24(a)(9) ("The argument [in appellant's brief] shall contain the contentions and reasons of the appellant with respect to the issues presented, including the grounds for reviewing any issue not preserved in the trial court, with citations to authorities, statutes, and parts of the record relied on."). Nguyen's reply brief also clarifies that "at issue is IHC's duty in regard to its own conduct." Therefore, we do not address whether IHC is vicariously liable for Dr. Witte's actions.

procedure owes the patient the duty of obtaining her informed consent. Mere status as a health care provider involved in a patient's care is insufficient to trigger the duty."); *Sherwood v. Danbury Hosp.*, 896 A.2d 777, 792 (Conn. 2006) ("[I]t is not the hospital but the patient's physician who, by virtue of his or her relationship with the patient and knowledge of the patient's medical condition and history, can best advise the patient of the risks and other pertinent information[.]"). Therefore, consistent with the overwhelming weight of precedent from other states, we agree that, absent any special circumstances, a hospital does not generally owe an independent duty to obtain a patient's informed consent to treatment.

B. Hospitals' Duty Regarding Informed Consent in Special Circumstances

¶12    This case involves a more complicated set of facts than is typical in evaluating a hospital's duty to obtain informed consent. Here, there is ample evidence that PCMC was integrally involved with the use of the sales demo ventilator. This was not a standard piece of equipment that a treating physician might or might not have chosen to use, in her discretion. Dr. Witte and members of the IHC committee responsible for evaluating the ventilator had established a protocol for testing the device, including that Dr. Witte was to draft an informed consent authorization for parental signature and to determine the appropriate test patients. Nguyen's son's condition was much more grave and unstable than that prescribed by the committee's approved test patient profile. The ventilator had not yet been tested on a single PCMC patient when it was used to transport Nguyen's son to another floor for a CT scan. It is undisputed that Tammy Bleak, an IHC employee and the chair of the committee, became involved in approving the use of the ventilator on the child. Other IHC employees were present and observed or participated in the ventilator's use. Even assuming that IHC had no prior intention of including Nguyen's son in the test protocol and that the ventilator was used as a last resort simply "because it was the only available transport ventilator that could provide the level and mode of ventilation support [the patient] required," there is no doubt that IHC was directly involved with the procedure and that equipment in PCMC's custody but not owned by it was being used outside the testing protocol put in place by IHC's committee. These unusual circumstances present the kind of situation in which a hospital should not receive an automatic exemption from the duty to obtain informed consent.

¶13    Our analysis is guided by a recent Utah Supreme Court case, *Jeffs v. West*, 2012 UT 11, 275 P.3d 228, which warns about the potential "misunderstanding of the role of

duty in tort analysis" and the mistake of "sometimes conflating duty with breach and proximate cause." *Id.* ¶ 22. *See also id.* ¶ 25 ("An essential difference among the elements is that duty is a question of law determined on a categorical basis, while breach and proximate cause are questions for the fact finder determined on a case-specific basis."). We caution, therefore, that our analysis of whether a duty exists as a matter of law still requires that breach and proximate cause be proven to establish liability in any particular case.

> Duty must be determined as a matter of law and on a categorical basis for a given class of tort claims. Duty determinations should be articulated in relatively clear, categorical, bright-line rules of law applicable to a general class of cases. The duty factors are thus analyzed at a broad, categorical level for a class of defendants.

*Id.* ¶ 23 (citation footnotes and internal quotation marks omitted). It is with this explanation in mind that we undertake our analysis of the question presented: Whether it is appropriate to impose a duty on a hospital to obtain informed consent when unfamiliar equipment on loan to the hospital, as the hospital considers its possible purchase, is used outside of the normal course of the hospital's established procedures.

## 1. Foreseeability and Likelihood of Injury

¶14 We initially consider whether it is foreseeable that harm might result from a hospital using unfamiliar, untested equipment. "The appropriate foreseeability question for duty analysis is whether a category of cases includes individual cases in which the likelihood of some type of harm is sufficiently high that a reasonable person could anticipate a general risk of injury to others." *Id.* ¶ 27. Hospitals themselves are generally not in a position to create a foreseeable risk of harm to others. But when a procedure that is out of the normal course occurs with the hospital's direct involvement, the risk of injury to a patient is foreseeable. The potential risk in situations where a hospital authorizes the use of equipment not owned by the hospital and that is largely unfamiliar to the hospital weighs in favor of the imposition of a duty.

¶15 The test equipment situation presented in this case is akin to a clinical trial conducted by a hospital or to experimental procedures implemented under a hospital's auspices. In such cases, courts have regularly imposed on hospitals a duty to obtain

informed consent. *See, e.g., Lenahan v. University of Chicago*, 808 N.E.2d 1078, 1084 (Ill. Ct. App. 2004) (holding that "under 'these particular facts,' a hospital as well as a physician may be held liable for claims arising from the lack of informed consent" when the hospital "undertook the responsibility to inform the plaintiff of the experimental nature of his surgery"); *Kus v. Sherman Hosp.*, 644 N.E.2d 1214, 1220 (Ill. Ct. App. 1995) ("[A] hospital, as well as a physician, may be held liable for a patient's defective consent in a case involving experimental intraocular lenses[.]"); *Friter v. Iolab Corp.*, 607 A.2d 1111, 1113 (Pa. Super. Ct. 1992) ("In this instance, the hospital, as a participant in a clinical investigation for the FDA, specifically assumed a duty to ensure that an informed consent was obtained [from] any patient participating in the study.").

## 2. Capacity to Avoid Loss

¶16 The next factor we consider is whether a hospital would be in the best position to take precautions to prevent such injury in the future.

> [T]his factor considers whether the defendant is best situated to take reasonable precautions to avoid injury. Typically, this factor would cut against the imposition of a duty where a victim or some other third party is in a superior position of knowledge or control to avoid the loss in question. In such circumstances, the defendant is not in a position to bear the loss, not because his pockets are shallow, but because he lacks the capacity that others have to avoid injury by taking reasonable precautions.

*Jeffs*, 2012 UT 11, ¶ 30 (citation footnotes omitted). Here, IHC had the capacity to quite easily obtain consent before authorizing the use of the sales demo ventilator on Nguyen's son. Dr. Witte could have discharged her obligation to obtain informed consent as the child's treating physician while simultaneously obtaining consent on behalf of IHC, particularly in light of her membership on the ventilator committee and her medical director position with PCMC. Tammy Bleak or another member of the committee could have done so as well, using the informed consent form that the committee had tasked Dr. Witte to develop. We recognize that in the general course of administering care in a hospital, the physician is typically in the best position to disclose potential risks to a patient. However, in cases where a hospital provides unfamiliar equipment that is not owned by the hospital and that is on the premises simply for

evaluation purposes, the hospital is in at least a comparable position to inform of the possible dangers.[9] Furthermore, the burden of fulfilling such a duty is not substantial and would not greatly interfere with the physician-patient relationship. The concerns that normally serve as the basis for limiting the liability of hospitals in informed consent cases are that the physician is more readily familiar with a patient's medical history, diagnosis, and other circumstances so as to provide the information necessary to obtain informed consent. *See, e.g., Giese v. Stice*, 567 N.W.2d 156, 163 (Neb. 1997); *Johnson v. Sears, Roebuck & Co.*, 832 P.2d 797, 798–99 (N.M. Ct. App. 1992). These concerns are not determinative, however, when use of the hospital's pilot-program equipment is the crux of an informed consent case. When a hospital authorizes the use of an unfamiliar piece of equipment under the hospital's control, the hospital should have an independent duty to obtain informed consent—a duty that may well be typically discharged, as a practical matter, by the treating physician on the hospital's behalf.[10]


CONCLUSION

¶17    Hospitals are not automatically immune from liability when unfamiliar equipment that is in their facilities for the purpose of evaluation is used on patients without first obtaining informed consent. It does not create an undue imposition to require that when a hospital, like PCMC in this case, allows the use of equipment that is not part of the hospital's usual inventory, the hospital has an independent duty to

---

[9]Indeed, in this case IHC seemed to reach the same conclusion because it had developed a protocol for testing the ventilator, including standards for the type of patient on whom it could be tested and a consent form.

[10]Nguyen also argues that IHC assumed a duty to obtain informed consent through publishing and posting a Patient Bill of Rights at PCMC. Because we hold that hospitals utilizing unfamiliar equipment not typically used by the hospital owe a duty to obtain informed consent, we decline to reach this issue. *See State v. Carter*, 776 P.2d 886, 888 (Utah 1989) ("[An appellate court] need not analyze and address in writing each and every argument, issue, or claim raised and properly before [the court] on appeal. Rather, it is a maxim of appellate review that the nature and extent of an opinion rendered by an appellate court is largely discretionary with that court.").

obtain informed consent.  The case-specific analysis of proximate cause and breach serves to ensure that this mandate will not be used to inequitably impose liability.

¶18    Reversed.


_____
Gregory K. Orme, Judge


-----


¶19    WE CONCUR:



_____
James Z. Davis, Judge



_____
Stephen L. Roth, Judge