FIFTH DIVISION
 October , 1996




No. 1-95-0959

ALEKSANDER ANTOL, ) Appeal from the
 ) Circuit Court of
 Plaintiff-Appellee, ) Cook County.
 )
 v. )
 )
LIBORIO CHAVEZ-PEREDA, ) 
 ) No. 88 L 22578
 Defendant, )
 )
 and )
 )
CHICAGO TRANSIT AUTHORITY, ) 
a Municipal corporation, ) The Honorable
 ) Edward G. Finnegan
 Defendant-Appellant. ) Judge Presiding


 JUSTICE HOURIHANE delivered the opinion of the court:
 Following a jury trial, plaintiff, Aleksander Antol (Antol),
was awarded $4.5 million for personal injuries he sustained as
the result of an accident involving his motorcycle and a station
wagon driven by defendant Liborio Chavez-Pereda (Chavez). The
vehicles collided after Chavez ran a red light. Plaintiff also
sued the Chicago Transit Authority (CTA) on a negligence theory,
alleging that one of its drivers waved plaintiff through the
intersection without first determining that it was safe to
proceed, and that the bus driver created a hazardous condition by
positioning his bus partially in the intersection, thus
obstructing plaintiff's view of the cross-traffic. The jury
allocated liability 60% to the CTA and 40% to Chavez. The CTA
appeals from the judgment entered on the jury verdict and the
order denying its post-trial motion. 155 Ill. 2d R. 303. 
 On appeal, the CTA asserts that no duty to use ordinary care
was created when the bus driver waved the plaintiff through the
intersection; that the jury's allocation of fault is against the
manifest weight of the evidence; that the trial court erred in
giving the missing-witness instruction for the CTA's failure to
produce the bus driver at trial; that the jury's verdict was
excessive and erroneous; and that accrual of interest on the
judgment should be stayed for the period in which preparation of
the record on appeal was delayed due to the actions of plaintiff.
 For the reasons that follow, we affirm in part, reverse in
part, and remand this matter to the trial court for a
determination of the relative liability of the defendants.
 BACKGROUND
 Just past midnight, on June 16, 1988, plaintiff was driving
his motorcycle southwest on Archer Avenue in Chicago. Riding on
the back of the motorcycle was a co-worker. They were both on
their way home from work. As plaintiff approached the
intersection of Archer and Halsted, plaintiff noticed a CTA bus
headed north on Halsted. The bus was stopped at the bus stop,
with part of the bus extending into the intersection. Although
the light was green for plaintiff, he slowed down as he
approached the intersection because he was not sure if the bus
was going to proceed. He was also concerned about other
northbound traffic.
 About 30 yards from the intersection, the bus driver
motioned to plaintiff to proceed. Plaintiff hesitated and slowed
down to about 10 mph. Twice more the bus driver waved him on. 
As soon as plaintiff accelerated and moved into the intersection,
he was struck by Chavez' vehicle. Chavez testified that the
light had changed to green before he entered the intersection. 
Chavez could not see the bus driver from his vantage point and
his testimony as to the location of the bus was inconsistent,
stating at one point that the bus extended into Archer, but later
testifying that the bus was stopped passed the crosswalk but
before the intersection.
 A taxi driver, Andrew Chutzik, who was working that night
and was travelling southwest on Archer behind plaintiff, observed
the collision. He testified that he first saw plaintiff
approximately ten blocks before the collision site and that
plaintiff was travelling between 25 and 35 mph. The posted speed
limit was 35 mph. He further testified that about one-half of
the bus was extended into the intersection.
 The taxi driver saw plaintiff slow down as he approached the
intersection and also observed the bus driver motion with his
hand for plaintiff to proceed. The bus driver was looking north
as he motioned to plaintiff. Plaintiff was struck as soon as he
entered the intersection. The taxi driver did not see the Chavez
station wagon before the collision.
 Also witnessing the collision was another motorist, James
Bullock, who was travelling south on Halsted. Bullock testified
that at the time of the collision the light for northbound and
southbound Halsted traffic was red. He did not see a CTA bus,
but did observe a station wagon heading north on Halsted at about
40 mph. He first noticed it because of its speed. He heard the
sound of plaintiff's motorcycle, looked to the left, saw
plaintiff travelling at about 30 mph with a green light, and
realized there would be a collision. Bullock had been stopped
at the red light for approximately ten seconds prior to the
collision. Bullock later told police that Chavez had gone
through a red light.
 Bullock's passenger did not see the events leading up to
impact, nor did she see a CTA bus at the intersection prior to
the collision. The only bus she saw was going south on Halsted
and did not arrive until after the accident occurred.
 Plaintiff did not mention the bus to anyone immediately
after the accident and the CTA denied that one of its buses was
at the scene. When the police arrived, there was no CTA bus at
the intersection and only two vehicles were indicated in the
accident report. Police issued three citations to Chavez. None
were issued to plaintiff. 
 As a result of the accident, plaintiff sustained multiple
contusions, a fracture near his left shoulder, and compound
fractures to his left leg, necessitating amputation of his leg
below the knee. 
 On December 9, 1988, plaintiff filed suit against Chavez and
the CTA. Plaintiff alleged the CTA was negligent in directing
plaintiff into the intersection before determining that it was
safe and creating a hazardous condition by positioning the bus
partially in the intersection. A jury awarded plaintiff
$4,492,710, allocating 60% of the fault to the CTA, and 40% to
Chavez. The CTA's post-trial motion was denied and the CTA
appeals. 
 ANALYSIS
 I
 The CTA first argues that in Illinois no duty to use
ordinary care is created when a driver signals or waves someone
through an intersection. Even if a correct statement of the
law, the CTA never asserted the absence of a duty in its answer
or affirmative defenses, or in any other pre-trial motion. 
Rather, the CTA defended the case on the basis that (i) no CTA
bus was at the intersection at the time of the accident, and (ii)
the plaintiff was negligent. In its motion for a directed
verdict, the CTA argued only that even if one of its buses was at
the intersection, there was no evidence that the CTA was
"responsible" for the accident. This argument appears to address
proximate cause, not duty. Additionally, the CTA's only
objection to the jury instruction tendered by plaintiff, which
set forth the law concerning the liability that may arise when
one performs a voluntary undertaking without using ordinary care,
was that it was "one-sided." The CTA never objected on the basis
that it did not accurately set forth the law relative to any duty
the CTA might have or that it was inapplicable in this case. It
was not until the CTA filed its post-trial motion for judgment
notwithstanding the verdict or a new trial that the CTA first
raised the issue of duty, arguing that there was no evidence that
the CTA had a duty to plaintiff and that no duty arose as a
matter of law.
 It is well settled that issues raised for the first time on
appeal will not be considered. Eagan v. Chicago Transit
Authority, 158 Ill. 2d 527, 534 (1994). It is also the rule that
a party may not raise on appeal defenses not interposed in its
answer before the trial court, and issues raised for the first
time in a post-trial motion will not be considered. Washington
v. Civil Service Commission of the City of Evanston, 120 Ill.
App. 3d 822, 828, 458 N.E.2d 952 (1984). The CTA argues that the
issue of duty, being a question of law, cannot be waived. 
However, the cases on which it relies, Kus v. Sherman Hospital,
268 Ill. App. 3d 771, 644 N.E. 2d 1214 (1995) and Bates & Rogers
Construction Co. v. North Shore Sanitary District, 92 Ill. App.
3d 90, 414 N.E. 2d 1274 (1981), are readily distinguishable. In
Kus, the trial court left to the jury the task of deciding
whether defendant owed a duty to plaintiff and so instructed the
jury. Although the plaintiff did not object to the jury
instruction, this court determined that the propriety of the jury
instruction was not waived on appeal. We reasoned that
"[p]ermitting a jury to assume a judicial role in determining
whether a duty existed, especially where we determine that a duty
did exist as a matter of law, deprives the plaintiff of a fair
trial." 268 Ill. App. 3d at 782. In the case sub judice, the
determination of whether a duty exists was not left to the jury. 
Thus, Kus is inapplicable to the facts present here. 
 In Bates & Rogers Construction Co., on review of the grant
of a motion to dismiss, we concluded that particular defenses to
the existence of a duty not specifically urged in the trial court
were not waived on appeal where they related purely to questions
of law which were inherent in the finding of the trial court that
no duty was owed. 92 Ill. App. 3d at 97. Here, the CTA never
challenged plaintiff's theory of the case that the CTA "took upon
itself the duty use ordinary care" when its driver waved
plaintiff through the intersection. Thus, unlike the defendant
in Bates, the CTA accepted plaintiff's assumption of duty theory.
 Further, our supreme court has held that where a defendant
municipality tried and lost a negligence case contending only
that the facts present could not establish a special duty owed by
defendant to plaintiff, defendant could not, on appeal, challenge
the circuit court's judgment on a wholly different basis,
attacking the very existence of the duty on constitutional
grounds. Leone v. City of Chicago, 156 Ill. 2d 33, 38 (1993). 
Here, the CTA tried and lost the case on the theory that no bus
was in the intersection, and that plaintiff was negligent. The
CTA cannot, on appeal, challenge the trial court's judgment on
the wholly different theory that no duty exists as a matter of
law. See also Diaz v. Chicago Transit Authority, 174 Ill. App.
3d 396, 528 N.E.2d 398 (1988) (CTA's failure to object to jury
instruction on highest degree of care resulted in waiver of duty
issue on appeal). Thus, we conclude that for purposes of this
appeal, the CTA has waived the issue of duty. 
 II
 We next consider whether the trial court erred in giving the
missing-witness instruction in connection with the CTA's failure
to produce the bus drivers who were scheduled to be travelling
northbound on Halsted during the time of the accident. See
Illinois Pattern Jury Instructions, Civil, No. 5.01 (1995 ed.).
 Where a missing witness instruction is inappropriately given
or counsel is allowed to comment in argument on the failure to
produce certain witnesses, if either acts to deprive the
appellant of a fair trial, the grant of a new trial is warranted. 
Simmons v. University of Chicago Hospitals and Clinics, 247 Ill.
App. 3d 177, 186, 617 N.E.2d 278 (1993), aff'd, 162 Ill. 2d 1
(1994). The decision to use the instruction or permit the
argument is reserved to the sound discretion of the trial court. 
Schaffner v. Chicago & North Western Transportation Co., 129 Ill.
2d 1, 22 (1989). 
 The inference that testimony of a witness within the party's
power to produce would be adverse to that party is available
when:
 "the missing witness was under the control of the
 party to be charged and could have been produced
 by reasonable diligence, the witness was not
 equally available to the party requesting that the
 inference be made, a reasonably prudent person
 would have produced the witness if the party
 believed that the testimony would be favorable,
 and no reasonable excuse for the failure to
 produce the witness is shown." Schaffner, 129
 Ill. 2d at 22.
The instruction should not be given if the witness is equally
available to either party or if the party provides a reasonable
excuse for the failure to produce the witness. Chiricosta v.
Winthop-Breon, 263 Ill. App. 3d 132, 157 (1994).
 Based on these criteria, it cannot be said that the trial
court abused its discretion by allowing the jury to be instructed
as to missing witnesses. Preliminarily, we note that the CTA
defended this case on the basis that no bus was at the
intersection at the time of the accident. However, the parties
stipulated that, according to the CTA's own operations planning
schedules in effect on June 15 and 16, 1988, buses were scheduled
to proceed northbound on Halsted through the Archer intersection
at 11:50 p.m., midnight, 12:10 a.m., 12:16 a.m. and 12:20 a.m. 
These times correspond to the approximate time frame of the
accident.
 The drivers were certainly under the control of the CTA and
presumably could have been produced with reasonable diligence. 
We note that pursuant to the Metropolitan Transit Authority Act
(70 ILCS 3605/1 et seq. (West 1994)), any person who is about to
commence a civil action against the CTA for personal injuries
must file a notice within six months of the injury or the date
the cause of action accrued with the CTA and its General Counsel. 
70 ILCS 3605/41 (West 1994). The purpose of this provision is to
allow the CTA to make a timely investigation, locate witnesses,
and generally be in a position to better defend itself against
bogus claims. Hinz v. Chicago Transit Authority, 133 Ill. App.
2d 642, 645, 273 N.E.2d 427 (1971). Notice was properly given
here, but the CTA offered no reasonable excuse for the failure to
identify and produce the bus driver(s). 
 In reponse to the plaintiff's request to produce the names
and addresses of the bus drivers and supervisors, the CTA stated
that documents disclosing the identity of the supervisors had
been destroyed, but that the investigation into the identity of
the bus drivers was continuing. The CTA never produced the names
of the bus drivers. At trial, counsel for the CTA argued that
records pertinent to the identity of the drivers had been
destroyed:
 "MR. KAPPLER [CTA counsel]: Well, it has
 been my position all along what I have been
 dealing with that it would be to our advantage to
 have that driver if we could identify one, and I
 have maintained all along since I have had the
 case and have repeatedly tried to get the names
 and have not been able to get them.
 THE COURT: Why?
 MR. KAPPLER: Because the information given
 to me is that these were destroyed. If there is
 no significance and they thought there was no
 driver involvement here, they don't keep the lists
 of scheduled drivers they do have, and I was not
 able to provide them."
According to Mr. Kappler, the records were destroyed within six
months of the occurrence. It is difficult to reconcile the CTA's
position that there was no driver involvement and therefore no
need to keep records from the date of the accident, when the
CTA's own schedule shows four buses travelling by the accident
scene at the appropriate time. However, to the extent that this
was the defense the CTA chose to pursue, it was reasonable to
expect that the CTA would call the drivers who were scheduled to
be travelling through the intersection at the approximate time of
the accident to testify. 
 As to the balance of the criteria under Schaffner, the bus
drivers were not equally available to plaintiff, the CTA having
failed to ever identify them. Moreover, we note that a witness
is not "equally available" to a party where, as here, there is a
likelihood that the witness will be biased against the plaintiff
by virtue of his or her employment with the defendant. Simmons
v. University of Chicago Hospitals and Clinics, 162 Ill. 2d 1, 8
(1994). A reasonably prudent person would have called the bus
drivers if their testimony supported the CTA's defense that no
bus was at the intersection, and as indicated above, counsel for
the CTA admitted that it would have been to the CTA's advantage
to have the bus driver at trial. The CTA offered no reasonable
excuse for not providing the witnesses, in light of its notice of
plaintiff's claim.
 On appeal, the CTA relies on plaintiff's failure to file a
motion to compel with respect to plaintiff's request to produce
the names of the bus drivers, and plaintiff's failure to include
the drivers in its Rule 237 notice for trial. In plaintiff's
Rule 237 notice he included only a general reference to CTA
supervisors, not drivers. However, the failure of a plaintiff to
serve a Rule 237 notice upon a defendant commanding the
production of a witness who, by virtue of employment, is
potentially biased against the plaintiff is not a reasonable
excuse for the defendant's failure to call the witness. Simmons,
247 Ill. App. 3d at 187. Similarly, we cannot say that
plaintiff's failure to file a motion to compel absolves the
defendant from its failure to call important witnesses at trial. 
Under these facts, it was not an abuse of discretion for the
trial court to give the missing witness instruction.
 III
 The CTA also asserts that the jury award of $4.5 million was
"shockingly high." The award was apportioned as follows:
 Disability $1,250,000
 Disfigurement 625,000
 Pain & Suffering 1,750,000
 Lost earnings 636,720
 Medical 230,990
The CTA first maintains that the verdict form improperly listed
disability and disfigurement as separate line items, contrary to
Illinois Pattern Jury Instruction, Civil, No. B45.03.A, thus
allowing plaintiff a double recovery. The CTA suggests a
remittitur of $625,000. The record discloses that the CTA never
objected to the verdict form on the basis that it did not comply
with the IPI form and this argument is therefore waived. See
Robinson v. Greeley & Hansen, 114 Ill. App. 3d 720, 724-25, 449
N.E.2d 250 (1983). Even if not waived, we disagree with the CTA
that the plaintiff obtained a double recovery. "Disability" and
"disfigurement" are not synonymous terms:
 "Physical 'Disability' is defined as '[a]bsence of
 competent physical, intellectual, or moral powers;
 *** incapacity caused by physical defect or
 infirmity." [citation] The term 'disfigure' means
 'to make less complete, perfect, or beautiful in
 appearance or character." Holston v. Sisters of
 the Third Order of St. Francis, 165 Ill. 2d 150,
 175 (1995).
See also Mulack v. Hickory Hills Police Pension Board, 252 Ill.
App. 3d 1063, 1068, 625 N.E.2d 259 (1993) ("Disability" is "the
inability to pursue an occupation or perform services for wages
because of physical or mental impairment"); Rapp v. Kennedy, 101
Ill. App. 2d 82, 84, 242 N.E.2d 11 (1968) ("Disfigurement" is
"that which impairs or injures the beauty, symmetry or appearance
of a person or thing; that which renders unsightly, misshapen or
imperfect or deforms in some manner." ) Thus, a plaintiff may be
disabled, but not necessarily disfigured. The converse is true,
as well. 
 Although the Illinois Pattern Jury Instruction applicable at
the time of trial in this matter listed the damages from
disability and disfigurement as one line item, we observe that
the 1995 Edition of Illinois Pattern Jury Instructions, Civil,
lists the damages from disability and disfigurement as two
separate items, either or both of which may be used where the
evidence so justifies. See IPI Civil 1995 Ed., No. 30.04 and
Notes on Use. Thus, the trend is to treat these damages
separately. We cannot say that where, as here, the plaintiff's
left leg was amputated below the knee, that it was erroneous to
seek damages for disability and disfigurement as separate
components of the total damage award. Although the itemization
of damages may create a risk of overcompensation where the
elements overlap (see Smith v. City of Evanston, 260 Ill. App. 3d
925, 935, 631 N.E.2d 1269 (1994)), in this case we are satisfied
that the jury could determine damages for plaintiff's disability
separate and distinct from plaintiff's disfigurement. 
 As to the CTA's claim that the jury award, in the aggregate,
"shocks the conscience," we disagree. The award of damages is
generally left to the sound, intelligent judgment, or good sense,
of the jury. Tonarelli v. Gibbons, 121 Ill. App. 3d 1042, 1050,
460 N.E.2d 464 (1984). A jury award should be reversed on appeal
only if it is evident that the amount "resulted from passion or
prejudice, and that the amount falls outside the limits of fair
and reasonable compensation and shocks the judicial conscience." 
Lundquist v. Nickels, 238 Ill. App. 3d 410, 435, 605 N.E.2d 1373
(1993). A jury's award is not subject to remittitur where it
falls within the flexible range of conclusions reasonably
supported by the evidence. Chambers v. Rush-Presbyterian-St.
Luke's Medical Center, 155 Ill. App. 3d 458, 468, 508 N.E.2d 426
(1987).
 Dr. Nillawan Yongsmith, plaintiff's post-amputation treating
physician, testified that plaintiff walks with an abnormal gait
and that due to the loss of sensation in his left leg, he will
never be stable on his feet. She also testified that as a result
of his injuries, he may already be suffering the effects of
premature arthritis. Additionally, further diagnostic testing
will be required to determine whether there has been nerve damage
to his right leg, and there exists the possibility that the
condition of this leg will worsen. Finally, given the nature of
plaintiff's injuries, he will require ongoing medical
consultation and treatment.
 Plaintiff and his wife testified as to the intense pain he
experienced following the accident, the pain he continues to
suffer in both legs, the difficulties navigating with a
prosthesis, and the impact his injuries have had on his ability
to maintain a normal life with his wife and children.
 Given the severity and permanency of the plaintiff's injury
to his left leg, the ongoing pain, the loss of mobility, and the
uncertainty of complications to his right leg, we believe that
the jury award falls within the limits of fair and reasonable
compensation. We note that a comparison of this verdict with
other cases involving the loss of a limb will not determine the
propriety of the jury award here as each case must be considered
on its own facts. Pasquale v. Speed Products Engineering, 252
Ill. App. 3d 724, 734-35, 624 N.E.2d 1277 (1993). The CTA has
similarly failed to establish a credible basis on which this
court may conclude that the jury award of $1.75 million for pain
and suffering is excessive.
 Finally, the CTA argues that no evidence was presented to
support the jury award of $636,720 for lost earnings. In
determining the amount of money that would fairly compensate the
plaintiff, the jury was instructed to consider "[t]he value of
time, earnings and salaries lost and the present cash value of
the time, earnings and salaries reasonably certain to be lost in
the future." See IPI Civil, No. 30.07 (1995 ed.). The first
portion of this instruction concerns earnings prior to trial; the
second portion includes impairment of the plaintiff's capacity to
earn. See IPI Civil, No. 30.07 (1995 ed.) and Comment. Because
the plaintiff here continued to work at his regular job up until
a short time before trial, the bulk of this award is necessarily
for lost future earnings. 
 Plaintiff testified on his inability to work. At the time
of the accident, he was employed as a freight elevator operator. 
Prior employment included work at a steel company, maintenance
work, truck driving, and work as a meat cutter. He testified
that as an amputee, he could not do any of these jobs. He also
stated that in the 12 to 18 month period prior to trial, his
condition had worsened. He was weak, dizzy at times, and
experienced pain in his right leg. Although plaintiff's employer
originally made an effort to accommodate plaintiff's injuries,
there was a subsequent change in the management company and a
dispute arose concerning plaintiff's job duties. Plaintiff
simply could not perform all the job functions he could prior to
the accident. It is not entirely clear from the record whether
plaintiff quit, was fired, or was forced out. Plaintiff's wife
testified that plaintiff cannot work because of the pain in both
legs.
 Although Dr. Yongsmith did not testify directly concerning
plaintiff's employment prospects, her testimony concerning nerve
damage to his right leg, plaintiff's permanent loss of sensation
and stability, and the possiblity that his condition may worsen
are relevant to the jury's determination of lost future earnings.
 Additionally, Roderick Bashir, a representative of the union
which includes freight elevator operators, testified as to lost
future earnings and plaintiff's prospects of employment as a
freight elevator operator. Bashir's testimony established that
he was familiar with the union, the job of an elevator operator,
the work performed by plaintiff, and the physical requirements
for the job. He testified that the hourly wage for freight
elevator operators was $10.95 and that based on a 24-year history
of such wages, the average hourly rate increase per year was 30
cents. He also testified that given plaintiff's physical
condition, he is not employable as an elevator operator. Based
on these historical wage figures and a projected 19-year work
life for plaintiff, Bashir estimated lost future wages at
approximately $563,000, plus an additional $73,000 for lost
fringe benefits.
 The CTA first maintains that Bashir was not disclosed as an
expert. However, the CTA's brief is devoid of any argument on
this issue. Rather, the CTA merely asserts in a conclusory
fashion that Bashir's testimony was a "surprise expert opinion." 
Mere contentions, without argument or citations of authority do
not merit consideration on appeal and will be deemed waived. 155
Ill. 2d R. 341(e)(7); McCleary v. Board of Fire and Police
Commissioners of City of Woodstock, 251 Ill. App. 3d 988, 995,
622 N.E.2d 1257 (1993).
 As to the CTA's claim that Bashir's testimony was
speculative, we disagree. Expert testimony as to lost earnings
is not required. See Tracy v. Village of Lombard, 116 Ill. App.
3d 563, 575, 451 N.E.2d 992 (1983). "[T]o recover lost earnings,
all that the law requires is evidence that will establish, with a
fair degree of probability, a basis for assessing damages." 
Levin v. Welsh Brothers Motor Service, Inc., 164 Ill. App. 3d
640, 656, 518 N.E.2d 205 (1987). Thus, where a plaintiff's
former employer was informed about the business in which
plaintiff was engaged, the employer's testimony as to that
plaintiff's potential earnings was not so speculative, remote or
uncertain as to make its admission error. Levin, 164 Ill. App.
3d at 656. Here, Bashir was informed about plaintiff's work as a
freight elevator operator, the requirements for the position, and
the wages paid. As in Levin, it cannot be said that Bashir's
testimony was so speculative as to make its admission error. 
 Finally, the CTA claims that plaintiff failed to introduce
evidence that he was not employable in any field, thus making the
award of future lost earnings improper and plainly the result of
passion or prejudice. As noted above, an award of future lost
earnings includes consideration of the extent to which
plaintiff's capacity to earn has been impaired. Impairment of
earning capacity is the difference between the amount the
plaintiff was capable of earning prior to his injury, and the
amount he is capable of earning after the injury. Patel v. Brown
Machine Co., 264 Ill. App. 3d 1039, 1061, 637 N.E.2d 491 (1994). 
Plaintiff need not present expert testimony as to what employment
opportunities are available to him. Loss of future earnings may
be established through plaintiff's testimony alone:
 "[T]he general rule is that the appearance of the
 plaintiff on the witness stand, his testimony as
 to the nature of his injuries and their duration
 is sufficient to take the question of impaired
 earning capacity to the jury." Patel, 264 Ill.
 App. 3d at 1061.
See also Shaheed v. Chicago Transit Authority, 137 Ill. App. 3d
352, 360, 484 N.E.2d 542 (1985). Thus, evidence that plaintiff's
injury was permanent and that it prevented him from continuing
employment are generally sufficient to permit a jury to arrive at
a calculation of lost future wages. Lewis v. Cotton Belt Route,
217 Ill. App. 3d 94, 116-17, 576 N.E.2d 918 (1991).
 Here, the jury had the benefit of plaintiff's testimony, as
well as the testimony of his wife, Mr. Bashir and Dr. Yongsmith. 
The jury could have concluded that plaintiff was unemployable. 
Plaintiff was 45 years old at the time of trial, a Polish
immigrant, who lacked any formal education after age 15. The
jury observed his injuries, as well as his lack of facility with
the English language. The jury heard him testify that he could
not perform any of the prior jobs he had held. A jury may draw
on its own experience in evaluating a plaintiff's future
employment potential. See Patel, 264 Ill. App. 3d at 1061-62. 
The jury fixed the amount of lost earnings at $636,720, thus
reflecting its acceptance of Bashir's estimates and its
determination that plaintiff was no longer able to work. Under
these circumstances we cannot say that the jury's determination
of lost future earnings was against the manifest weight of the
evidence.
 Based on the foregoing, we affirm the jury award in its
entirety.
 IV
 We next consider the CTA's claim that the jury's
apportionment of negligence 40% to Chavez and 60% to the CTA is
not supported by the evidence. In a negligence action, a
comparison of the parties relative fault and allocation of
liability are matters peculiarly within the province of the jury,
which will not be disturbed on appeal unless contrary to the
manifest weight of the evidence. Junker v. Ziegler, 113 Ill. 2d
332, 339-40 (1986); McShane v. Chicago Investment Corp., 235 Ill.
App. 3d 860, 876, 601 N.E. 2d 1238 (1992). A verdict is against
the manifest weight of the evidence where a contrary verdict is
clearly evident or where the findings of the jury are
unreasonable, arbitrary and not based on the evidence. Maple v.
Gustafson, 151 Ill. 2d 445, 454 (1992). 
 Here, the evidence adduced at trial established that the
plaintiff was driving southwest on Archer Avenue within the
posted speed limit of 35 mph, that the light was green as he
approached the intersection of Archer and Halsted, and that the
bus driver, who was facing north on Halsted, waved plaintiff
through the intersection. Testimony also established that Chavez
was driving northbound on Halsted at approximately 40 mph, and
that the light was red as he sped through the intersection. The
precise location of the bus was never established, nor was there
testimony, expert or otherwise, which demonstrated what plaintiff
and Chavez might have been able to see had the bus been
positioned behind the crosswalk, given the relative speed and
position of the vehicles. Under these facts, the jury's
allocation of 60% of the fault to the CTA is plainly unreasonable
and contrary to the evidence.
 Plaintiff proceeded on the theory that the CTA driver
negligently positioned his bus in the intersection in violation
of both State law (625 ILCS 5/11-306 (West 1994)) and municipal
ordinance (Municipal Code of Chicago, Sec. 27-254 (1984)), and
further negligently waved plaintiff through the intersection. 
Neither act of the CTA, considered alone, could provide a
reasonable basis for the jury's allocation of 60% of liability to
the CTA. Even considering the combined effect of these two
purported acts, we cannot accept the proposition that the CTA's
liability is greater than that of defendant Chavez who was
driving over the speed limit, ran a red light, and actually
collided with plaintiff. 
 We reiterate that for purposes of this appeal the CTA has
waived the question of duty and we therefore express no opinion
as to whether the CTA was under a duty to use ordinary care when
its driver waved plaintiff through the intersection. That is a
matter best left to the trial court. We nonetheless note that
whatever duty the CTA may be under by virtue of municipal
ordinance, statute or otherwise, such duty does not somehow make
the CTA liable in tort for the unlawful conduct of another
motorist. In other words, a mere wave by the CTA bus driver does
not amount to a guarantee or blanket assurance that all other
vehicles in the area will obey the traffic laws. Just as
plaintiff was entitled to presume that the cross-traffic on
Halsted would obey the traffic signal (see Boylan v. Martindale,
103 Ill. App. 3d 335, 431 N.E.2d 62 (1982)), the bus driver was
entitled to presume that a vehicle approaching the bus on the
left would observe the law and stop at the red light. Moreover,
there was no evidence from which the jury could conclude that the
position of the bus and the conduct of the bus driver were in any
way connected to the unlawful conduct of Chavez in running the
red light. Thus, we cannot agree with plaintiff that the bus
driver "should have foreseen that plaintiff could be struck by
Chavez' vehicle." Although the CTA may be a more attractive
defendant than Chavez, the CTA is not the insurer of every
accident that happens in close proximity to a CTA bus. 
 Accordingly, we remand this matter to the circuit court
for a new trial on apportionment of liability.
 V
 Finally, on motion taken with the case, the CTA asks this
court to stay judgment interest for the period from June 28, 1995
to August 26, 1995. The CTA claims that plaintiff's counsel was
dilatory in reviewing certain transcripts which were part of the
record on appeal, resulting in a two-month delay in filing the
record. Section 2-1303 of the Code of Civil Procedure governs
interest on judgments and provides in relevant part:
 "Judgments recovered in any court shall draw
 interest *** from the date of the judgment until
 satisfied ***. The judgment debtor may by tender
 of payment of judgment, costs and interest accrued
 to the date of tender, stop the further accrual of
 interest on such judgment notwithstanding the
 prosecution of an appeal, or other steps to
 reverse, vacate or modify the judgment." 735 ILCS
 5/2-1303 (West 1994).
Section 2-1303 makes no provision for a suspension of interest
where delays are experienced during the appeal process and we
decline to carve out such an exception here. Rather, the statute
provides only one method for a judgment debtor to stop the
accrual of interest, and that is by tendering payment of the
judgment, costs, and interest accrued to date. Here, however,
there is no way for the judgment debtor, the CTA, to know how
much money must be paid to stop the further accrual of interest
until such time as the allocation of damages are determined on
remand. Accordingly, judgment interest will not run until
judgment is entered on the verdict rendered upon remand and the
exact extent of the CTA's liability is settled. See Decker v.
St. Mary's Hospital, 266 Ill. App. 3d 523, 525-26, 639 N.E.2d
1003 (1994); Poe v. Industrial Commission, 230 Ill. App. 3d 1, 5-
10, 595 N.E.2d 593 (1992).
 For all the foregoing reasons, we affirm the judgment of the
Circuit Court of Cook County as to the amount of the damage
award, but reverse and remand for a new trial as to apportionment
of liability.
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.